[No. B057370. Second Dist., Div. Four. Mar. 26, 1993.]

CITY OF PASADENA, Plaintiff and Appellant, v.
THE STATE OF CALIFORNIA, Defendant and Respondent.

COUNSEL

Victor J. Kaleta, City Attorney, Berger & Norton and Marlena J. Mouser for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, N. Eugene Hill, Assistant Attorney General, Henry G. Ullerich and Sonja K. Berndt, Deputy Attorneys General, for Defendant and Respondent.

OPINION

**EPSTEIN, Acting P. J.**—This appeal arises from a heated public debate about the placement of a parole office in the San Gabriel Valley by the State of California (the State) Department of Corrections (the Department). Responding to complaints from citizens of Alhambra and Monterey Park, the State agreed to relocate a parole office from that area to the Pasadena area. The State selected a site in an existing office building in the Pasadena Civic Center. It determined that its lease of the building was exempt from the requirements of the California Environmental Quality Act (CEQA), Public Resources Code section 21000 et seq.[1] Pasadena brought a petition for writ of mandate to void the lease. The trial court ultimately denied the petition and entered a judgment in favor of the State.

On appeal, Pasadena makes three arguments in support of its position that the State violated CEQA: that the project does not come within the categorical exemption relied upon by the State; that the State's investigation prior to issuing the exemption was inadequate; and that an exception to the exemption applies because there was a showing that there was a possibility that the lease will have a significant effect on the environment due to unusual circumstances.

We first address a preliminary issue raised by the State: that Pasadena failed to exhaust its administrative remedies under CEQA. We next conclude

---

[1]Unless otherwise indicated, statutory references are to the Public Resources Code. "Guidelines" refers to the guidelines implementing CEQA which are contained in title 14 of the California Code of Regulations section 15000 et seq.

that substantial evidence supports the Department's conclusion that a categorical exemption applies. Moreover, because the exemption applies, the State was not required to conduct the extensive investigation sought by Pasadena prior to notification of the exemption.

As we see it, however, the principal issue in the case is whether Pasadena has submitted sufficient evidence to establish that the exception to the categorical exemption was applicable. That issue turns on whether Pasadena presented substantial evidence of an adverse physical change related to the lease. We conclude that it did not.

We next consider Pasadena's argument that the State failed to comply with Government Code section 14681.5, which requires the Director of the Department to notify local officials that the Department intends to locate a parole office in their area. We conclude that the notice given was adequate.

Finally, Pasadena argues that the relocation of the parole office from the adjoining communities of Alhambra and Monterey Park to Pasadena constituted a violation of the constitutional right to substantive due process. We find no merit in the argument.

### FACTUAL AND PROCEDURAL SUMMARY

In July 1987, in order to serve a growing parole population in the San Gabriel Valley, the State, through its Department, leased a site on West Garvey in Alhambra for a parole office. The site was adjacent to the City of Monterey Park. The Garvey office served approximately 1,200 parolees who resided in the San Gabriel Valley communities of El Soreno, Alhambra, Monterey Park, South San Gabriel, South El Monte and El Monte. A second parole office in Alhambra, known as the "Main Street Office," served an additional 1,200 parolees who resided in Highland Park, Eagle Rock and Altadena. Five hundred of the parolees served by the Main Street office lived in Pasadena, but in 1987 there was no parole office in the Pasadena area.

In the summer of 1988, residents of Alhambra and Monterey Park began protesting against the presence of the Garvey office. Both the citizens and local law enforcement officials perceived the Garvey office as a threat to public safety. Representatives of Alhambra and Monterey Park urged State officials to relocate the Garvey office, arguing that it was unfair that Alhambra should be the site of two parole offices since a majority of the parolees served by the offices resided in other communities.

In early October 1988, Craig Brown, Undersecretary of the State Youth and Correctional Agency, offered to relocate the Garvey office provided that

an alternate site could be found and that Monterey Park and Alhambra agreed to share in the costs of the relocation. When the two cities agreed to this proposal, the problem of locating a parole office was focused on Pasadena, which was considered more accessible to the large numbers of parolees in the area.

Employees of the Department were assigned to find a new location for a parole office to replace the Garvey office. Following the placement of an advertisement for suitable office space, employees of the Department and of the state Department of General Services, Office of Real Estate and Design Services investigated more than 14 locations.

In October 1988, Jerome DiMaggio of the Department notified Pasadena officials that the Department was interested in a site on Rosemead Boulevard. In October 1988, DiMaggio wrote to Mayor William Thomson of Pasadena to notify him that the Department was also interested in a building located at 333 East Walnut Street. This location, which was ultimately leased by the State, is the object of this appeal.

Following a tour of several sites in December 1988, five in Pasadena were deemed acceptable, including the building on Walnut Street. At first the owner, Ms. Lim, was not interested in leasing to the Department because she was trying to obtain permits authorizing construction of a multistory building on that location.

Pursuant to Government Code section 14681.5, various local officials, including the mayor and city clerk of Pasadena, were notified in December, 1988 that the Department was considering leasing an existing building at five sites in Pasadena, including Walnut Street. No opposition to any of these sites was received within 60 days of the notice.

When the Department focused its leasing efforts on a site on Rosemead Boulevard in Pasadena in early 1989, public opposition swelled. A group of Pasadena officials and howeowners met in Sacramento with representatives of the Governor and Undersecretary Brown to express their opposition to locating a parole office at the Rosemead Boulevard site. The representatives of the State responded that they wanted a site in Pasadena. They understood that the Pasadena group would assist in finding an alternate location.

For 18 months, alternative locations in Pasadena were investigated and rejected for various reasons, including location and lack of parking. Citizens of various areas of Pasadena rallied against location of the parole office in their neighborhoods. On May 30, 1989, the Pasadena Board of Directors

adopted a resolution opposing the placement of a parole office anywhere in the city. This position was reaffirmed in May and June 1990.

Ultimately, Department officials determined that the Walnut Street site was the most suitable. On September 14, 1990, the Department filed a notice of exemption from the requirements of CEQA pursuant to Guidelines section 15062, based on the fact that the lease of the Walnut Street site involved only the lease of existing office space which "has been determined not to have a significant impact upon the environment." In October 1990, the Department finally entered into a five-year lease with Ms. Lim for the Walnut Street site.

On October 17, 1990, Pasadena filed a petition for writ of mandate challenging the State's actions. The amended petition for writ of mandate, the charging pleading in this case, was filed in January 1991. The amended petition alleged causes of action for denial of substantive due process, for breach of the mandatory duty to notify local officials of the Department's intent to lease a building pursuant to Government Code section 14681.5, and for noncompliance with CEQA. Pasadena noticed a hearing for February 20, 1991, and supported its petition with points and authorities, declarations and exhibits.

The State answered the petition and filed points and authorities in opposition to the petition, supported by its own declarations and exhibits. At the hearing on Pasadena's petition, the State argued that Pasadena had failed to exhaust its administrative remedies in that section 21177 requires a party opposing a CEQA action to present its position to the agency involved in writing or orally. The State acknowledged that no public hearing was held, but argued this was because none was required. The State argued that Pasadena had failed to comply with section 21177 because no objection to the Walnut Street site was presented to the Department. Pasadena responded that it was not required to present objections under section 21177, subdivision (e) because the Department held no hearing on its determination that the lease project was exempt from CEQA requirements. Alternatively, Pasadena argued that the State was aware that the site conflicted with plans to make the civic center into a residential district.

In response to the trial court's concern, Pasadena relied on statistics indicating that two-thirds of parolees commit new felony offenses. The State refused to stipulate that an increase in crime is an environmental issue covered by CEQA. The trial court asked counsel for Pasadena: "Are you saying that some people are pollutants, counsel?" Pasadena's attorney conceded that this was her client's position. Pasadena also argued that the

Department's own guidelines provide that a parole office should not be located near schools and residences. Therefore, Pasadena argued, the State should be required to conduct a CEQA investigation to determine whether a full environmental impact report was necessary.

The State responded that Pasadena's argument about possible crime related to the parole office was not sufficient to establish an exception to the categorical exemption for use of an existing building because Pasadena could not show "a reasonable possibility that there will be significant . . . *environmental* effects due to unusual circumstances" as required by Guidelines section 15300.2, subdivision (c). The Walnut Street site was across the street from the Pasadena courthouse, in which a Los Angeles County probation office is located. A new police station is adjacent to the courthouse.

The trial court concluded that Pasadena's showing of a threat to public safety posed by the parolees was insufficient and conclusionary. The court observed that the area surrounding the Walnut Street site was nonresidential, and that both a courthouse and a police station with jail facilities were sited in the immediate area. The court concluded that Pasadena had failed to show that a parole office would increase crime in the neighborhood. It denied the petition for mandate, and judgment in favor of the State was entered. Pasadena filed a timely notice of appeal.[2]

DISCUSSION

I

*CEQA*

 Pasadena argues that the Department's determination that its lease of the Walnut Street site was exempt from CEQA is flawed in two respects. First, that there was no basis for application of the exemption because the Department failed to consider the existing use of the building; and second, that the Department failed to consider whether this project falls within the exception to the categorical exemptions where "there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).) The State argues that Pasadena failed to exhaust its administrative remedies under CEQA.

As we shall explain, under the applicable standard of appellate review, we find that the State did not abuse its discretion in declaring this project

---

[2]Ms. Lim, the property owner, is not a party to the appeal.

exempt from CEQA. In so deciding, we reject the State's argument that Pasadena failed to exhaust its remedies under CEQA.

A. *Exemption Procedure*

■ "In CEQA, the Legislature sought to protect the environment by the establishment of administrative procedures drafted to 'Ensure that the long-term protection of the environment shall be the guiding criterion in public decisions.' [Citation.] To achieve these objectives, CEQA and the guidelines issued by the State Resources Agency to implement CEQA establish a three-tiered structure. *If a project falls within a category exempt by administrative regulation* [citations], or 'it can be seen with certainty that the activity in question will not have a significant effect on the environment' [citation], *no further agency evaluation is required.* If there is a possibility that the project may have a significant effect, the agency undertakes an initial threshold study [citation]; if that study demonstrates that the project 'will not have a significant effect,' the agency may so declare in a brief Negative Declaration. [Citation.] If the project is one 'which may have a significant effect on the environment,' an EIR [environmental impact report] is required. [Citations.]" (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66], fn. omitted, italics added.)

■ Only the first tier of this structure—the Department's invocation of a categorical exemption—is involved in this case. Section 21084 provides that the Guidelines must include a list of classes of projects "which have been determined not to have a significant effect on the environment and which shall be exempt . . . ." These are referred to as categorical exemptions from CEQA. Before we examine the specific exemption invoked here, it is important to understand what is required of an agency which determines that a project comes within a categorical exemption.

CEQA is codified in division 13 of the Public Resources Code. Section 21080, subdivision (b) provides that the division does not apply to various categories of projects, including those defined as exempt in section 21084. (§ 21080, subd. (b)(10).) The Guidelines explain that the applicability of a categorical exemption is the first step in the CEQA process.[3] If the project is exempt, the process need not proceed further. The agency may prepare a notice of exemption. (Guidelines, § 15002, subd. (k)(1).) The notice of exemption must include a brief description of the project, a finding that the

---

[3]Guidelines section 15002 states the basic concepts of CEQA. Subdivision (k) provides: "Three Step Process. An agency will normally take up to three separate steps in deciding which document to prepare for a project subject to CEQA. [¶] (1) In the first step the lead agency examines the project to determine whether the project is subject to CEQA at all."

project is exempt, with a citation to the applicable Guidelines provision, and a brief statement of reasons to support the finding. (Guidelines, § 15062, subd. (a).)

The determination of whether an activity is exempt from CEQA is made as a part of the preliminary review process.[4] That process is described in Guidelines section 15060, which makes it clear that the applicability of an exemption must be made *before* the agency begins its formal environmental evaluation of the project.[5] It is plain that, under the statutory and regulatory scheme, if a project falls within a categorical exemption no formal environmental evaluation is made. (See *Association for Protection etc. Values* v. *City of Ukiah* (1991) 2 Cal.App.4th 720, 726 [3 Cal.Rptr.2d 488] ["Where a project is categorically exempt, it is not subject to CEQA requirements and 'may be implemented without any CEQA compliance whatsoever.' [Citations.]"].)

This point is important because Pasadena challenges the adequacy of the Department's investigation which preceded the notification of the exemption filed on September 14, 1990. As we shall explain, applying the appropriate standard of review, we conclude that the State properly invoked the exemption.

The notice of exemption filed by the Department stated that the Walnut Street lease was exempt under Guidelines section 15301 because it "involves the leasing of existing office space which has been determined not to have a significant impact upon the environment." The State argues that the lease of the Walnut Street site falls within categorical exemptions described in subdivisions (a) and (f) of Guidelines section 15301.

Guidelines section 15301 describes class 1 of the categorical exemptions. That class covers existing facilities, structures and equipment.[6] Subdivision (a) of Guidelines section 15301 provides an exemption where: "Interior or exterior alterations involving such things as interior partitions, plumbing, and electrical conveyances" are made. Subdivision (f) of Guidelines section 15301 provides an exemption for a project where there is "Addition of safety

---

[4]Guidelines section 15061, subdivision (a) provides: "As part of the preliminary review, a public agency shall determine whether a particular activity is exempt from CEQA."

[5]Guidelines section 15060, subdivision (b) provides in pertinent part: "[T]he lead agency shall begin the formal environmental evaluation of the project *after* accepting an application as complete and determining that the project is subject to CEQA." (Italics added.)

[6]Guidelines section 15301 provides in pertinent part: "Class 1 consists of the operation, . . . maintenance, or minor alteration of existing public or private structures, . . . involving negligible or no expansion of use beyond that previously existing, . . ." Section 15301 then describes 15 types of projects which come within this exemption, but expressly states that the list is not exclusive.

or health protection devices for use during construction of or in conjunction with existing structures, facilities, . . ."

### B. *Exhaustion of Administrative Remedies*

█ The State argues that Pasadena failed to exhaust its administrative remedies under CEQA by failing to present the basis of its objections to the Walnut Street lease prior to the filing of the writ petition. We find no merit in the argument. Guidelines section 15062, subdivision (d) provides: "The filing of a Notice of Exemption and the posting on the list of notices start a 35 day statute of limitations period on legal challenges to the agency's decision that the project is exempt from CEQA." Pasadena filed its petition for writ of mandate within 35 days from the filing of the notice of exemption, satisfying the requirements of the Guidelines.

Moreover, the State has taken the position that it was not required to hold a hearing prior to filing the notice of exemption. We agree. It would be paradoxical to construe CEQA to require Pasadena to present a complete explication of its objections to the claimed exemption before the State filed its determination that the project is exempt.

### C. *Application of the Exemption*

█ The standard of review of the Department's determination that the project is exempt is codified in CEQA. The parties agree that we must apply section 21168.5: "In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

█ Since this is a traditional mandamus action pursuant to Code of Civil Procedure section 1085, the trial court was not limited to the administrative record, but was empowered to receive and consider additional evidence. (See *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p .79, fn. 6; *McQueen* v. *Board of Directors* (1988) 202 Cal.App.3d 1136, 1144 [249 Cal.Rptr. 439].) "On appeal, we resolve factual conflicts in favor of those express or implicit findings by the trial court which are supported by substantial evidence." (*McQueen* v. *Board of Directors, supra,* 202 Cal.App.3d at p. 1144.)

"Substantial evidence" is defined by the Guidelines: " 'Substantial evidence' as used in these guidelines means enough relevant information and

reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made is to be determined by examining the entire record. Mere uncorroborated opinion or rumor does not constitute substantial evidence." (Guidelines, § 15384, subd. (a).)

■ The State submitted the declaration of Carole L. Reichel, a business services officer for the Department. Reichel was responsible for parole office site searches, and for filing the appropriate CEQA compliance documents. Reichel was assisted by the Department of General Services, Office of Real Estate and Design Services. She declared that while there are no written guidelines or requirements for the placement of parole offices, the Department uses general criteria which include: (1) commercial zoning; (2) proximity to public transportation; (3) a building in which the Department would be the sole tenant; (4) adequate parking; (5) front and rear access; (6) a site which is not adjacent to elementary schools, schools in general, and parks.

Reichel determined that the lease was categorically exempt under Guidelines section 15301. She declared that she made this determination because: "a) The location was zoned for office use and [the Department] would be using the location for an office building. [¶] b) The present use of existing structure was as an office building with several suites. The parole office we intended to establish would have a total number of staff of 44. A parole office has clients visiting their parole officers. Although the new parole office would serve approximately 1000 parolees, most parolee contacts are conducted away from the parole office. [¶] c) The parole office intended to use 24 parking spaces for state vehicles. I was aware that the parking area for the existing structure was quite large and there would be several spaces in addition to the parking spaces that [the Department] would lease, which would be available for public parking. [¶] d) The alterations that I understood would need to be made to the existing facility were, for the most part, strictly to ensure that the building met safety and health requirements for state buildings. The proposed alterations consisted of asbestos removal, ensuring that the bathrooms were accessible to the disabled and that the corridors were in compliance with the State Fire Code. The interior alterations would consist of partition removal and placement."

Reichel also declared that she was aware that a courthouse was located across the street from the Walnut Street site and that a police station would soon be constructed next to the courthouse. She was aware that there were residential apartments behind the Walnut Street building. Reichel was not told, prior to the filing of the mandate petition, that the library was of

historic and cultural significance or that the Pasadena Master Plan recommended residential development on the Walnut Street site.

The State also presented the declaration of Ian J. Ekholm, a real estate officer with the Department of General Services, Office of Real Estate and Design Services. Ekholm was involved in the lease of the Walnut Street site. In his declaration, he explained that the only alterations to the building were required to meet the state fire rules for corridors, to remove asbestos, to remodel bathrooms and create a bathroom with access for the disabled, and to create a urinalysis room. Other work included the construction and removal of interior partitions, interior and exterior painting, interior carpeting and tree trimming.

Ekholm testified that the lease entered into by the State required a full-time parking attendant to operate a lot for the Walnut Street site, which is a "buffer" between that building and the library. Ekholm also testified that he had toured the area, and discussed the proximity of the library, the police station down the street, a restaurant and bar, and a seminary. Prior to leasing the building to the State, the Walnut Street building had been used for executive suites, primarily occupied by attorneys. In the past, the building housed an office of the State Board of Equalization. Both Ekholm and Reichel felt that there would be less traffic at the Walnut Street site with the parole office than there had been under the previous uses.

Pursuant to the State's request, we have taken judicial notice of portions of Pasadena's revised zoning ordinance. (Pasadena Mun. Code, §§ 17.04.020-17.04.030, 17.80.010-17.80.050.) These provisions require an applicant for a building permit to obtain a code compliance certificate before the building permit may be issued. (Pasadena Mun. Code, § 17.80.010.) As part of the code compliance process, the zoning administrator must determine that the environmental documentation accompanying an application is complete under CEQA. (Pasadena Mun. Code, §§ 17.80.30, 17.80.050.) A Pasadena building permit application submitted for the Walnut Street site in November 1990 described the improvements listed in the Ekholm and Reichel declarations.

In a June 20, 1990, agenda report to the Pasadena Board of Directors, the city manager discussed several of the sites under consideration by the Department. As positive factors concerning the Walnut Street site, the city manager listed "Close to Police Station," "Close to service area," "Over 9,000 sq. ft. available for rent," "Good site identity and street access," "Former site of state office use," that negotiations and plans for the improvements were under preparation, and "Over 50 parking spaces available." The

negative considerations were the proximity to the public library and apartment buildings.

The Reichel and Ekholm declarations demonstrate that the improvements to the Walnut Street building were minor and within the scope of Guidelines section 15301, subdivisions (a) and (f) because they involved changes in interior partitions and work required to bring the building up to established safety and other standards. This constitutes substantial evidence within the definition of Guidelines section 15384 to support the Department's determination that the lease of the Walnut Street site was categorically exempt from CEQA. This takes us to the more difficult issue of whether an exception to this exemption should have been applied.

### D. *Significant Effects Exception*

Pasadena's second challenge to the categorical exemption is both procedural and substantive. First, Pasadena argues that the Department failed to consider whether an exception applied. Second, Pasadena argues that the Walnut Street lease was not exempt because "there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).) The State responds that the significant effect exception does not apply here because Pasadena failed to show that the circumstances are unusual within the meaning of CEQA, and because there is no reasonable probability that the lease will have a significant physical effect on the environment as required.

We agree with the State that Pasadena's showing was not adequate under CEQA as interpreted by the courts. As we explain, Pasadena's argument is based largely on rumor and hearsay concerning the alleged threat posed by parolees using the Walnut Street site. We do not hold, as a matter of law, that such concerns cannot rise to the level necessary to require further study under CEQA if related to a physical change in the environment. We conclude only that the record made by Pasadena in this case was not adequate to establish an exception to the categorical exemption.

In *Dehne* v. *County of Santa Clara* (1981) 115 Cal.App.3d 827 [171 Cal.Rptr. 753] the court observed: "Plaintiffs' assertion appears to suggest that this court should scour the administrative record for substantial, unrebutted evidence of what, in our opinion, constitutes a significant effect on the environment. However, it is not the proper function of this court to independently weigh the evidence. [Citations.]" (*Id.* at p. 844, and cases collected therein.) "A party challenging an agency's exemption decision must produce substantial evidence that the project has the potential for a

substantial adverse environmental impact." (*Association for Protection etc. Values* v. *City of Ukiah, supra,* 2 Cal.App.4th at p. 728.) In determining whether there is substantial evidence of a significant effect on the environment, "this court may not substitute its judgment for that of the state agency and must resolve reasonable doubts in favor of its decision. [Citations.]" (*Meridian Ocean Systems, Inc.* v. *State Lands Com.* (1990) 222 Cal.App.3d 153, 170 [271 Cal.Rptr. 445].)

## 1. *Procedural Challenge*

■ Pasadena argues that the State did not conduct an inquiry sufficient to eliminate the possibility that the significant effect exception applied. The excerpts from the record cited by Pasadena to support this argument do not accurately reflect the actions of the Department preceding the issuance of the exemption.

Pasadena quotes from the deposition of Kathleen Rokusek, a business services officer for the Department, who testified that she had not conducted an investigation concerning the CEQA exemption, although her signature appears on the form. This is the only evidence cited by Pasadena regarding the investigation conducted by the Department before the exemption was issued. As we have discussed, the record reflects that both Carole Reichel and Ian Ekholm considered the other buildings in the area and their uses in determining that the categorical exemption applied. Moreover, Reichel's declaration states that she was Kathleen Rokusek's supervisor and that she instructed Rokusek to file the notice of exemption. Reichel declared: "Although Ms. Rokusek signed the notice, she did not have familiarity with this project. Since I had been involved with [the] project since October 1988, and specifically with the Walnut Street site since December 1988, I determined that the project of leasing the existing office building for a parole office was categorically exempt from the provisions of CEQA under the CEQA guidelines, section 15301 (Class 1), and that neither a Negative Declaration nor an Environmental Impact Report would be necessary. I had visited the Walnut Street site on two occasions, prior to the filing of the CEQA notice and I had telephone contacts with Director (now Mayor) Jess Hughston, from the Pasadena Board of Directors."

We already have summarized the factors relied upon by Reichel and Ekholm in determining that the categorical exemption applied. Pasadena places great reliance on the Department's alleged violation of its own Guidelines against placing a parole office in proximity to schools and parks. This argument was countered by the declaration of Reichel and the deposition testimony of Jerome DiMaggio, supervisor of this region for the Department, that these criteria are not actual guidelines. Undersecretary Brown

testified that it is often difficult to meet all the criteria in an urban area, but that the "controlling principal [*sic*] is that the offices should be where the parolees are."

On this record, we are satisfied that the Department made the necessary investigation before issuing the exemption.

2. *Application of significant effect exception*

The next issue is whether there is substantial evidence to support the determination that the significant effect exception is applicable. Section 15300.2, subdivision (c) of the Guidelines provides: "A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances."

Pasadena argues that the exception applies because the Walnut Street site is next door to the Central Library, a historic building of cultural significance, and because the Pasadena Master Plan calls for residential development in the area, some of which is in progress. This argument overlooks the context of the site. (Guidelines, § 15384, subd. (a).) It fails to discuss the criminal justice facilities already operating in the immediate area of the parole office: the courthouse, the probation office and the old and new jails.

The Guidelines do not define the term "unusual circumstances." Only one of the cases cited by the parties directly addresses this prong of the exception at issue. In *McQueen* v. *Board of Directors, supra*, 202 Cal.App.3d 1136, an open space district filed a notice of CEQA exemption for its purchase of two parcels of surplus federal property, one a former Air Force station and the other a ground air transmitter receiver site. The district argued that the mere acquisition of the property did not constitute a physical change to make the significant effect exception applicable. (*Id.* at p. 1149.)

The *McQueen* court concluded that the "known existence of PCB [polychlorinated biphenyls] and other hazardous wastes on property to be acquired is an unusual circumstance threatening the environment." (202 Cal.App.3d at p. 1149.) The court also held that these toxics constituted a waste disposal problem which constituted a "significant effect on the environment" within the meaning of CEQA. (*Ibid.*)

We conclude that the lease of the Walnut Street site for use as a parole office does not constitute an "unusual circumstance" within the meaning of CEQA in light of the presence of the other custodial and criminal justice

facilities in the immediate area. On this basis, we hold that Pasadena has not established that the significant effects exception applies.

Nor did Pasadena satisfy the other prong of the exception: that there is a reasonable possibility that the lease would have a "significant effect" on the environment within the meaning of Guidelines section 15300.2, subdivision (c).

"Significant effect on the environment" is defined as "a substantial, or potentially substantial, *adverse change in any of the physical conditions within the area affected by the project* including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change related to a physical change may be considered in determining whether the physical change is significant." (Guidelines, § 15382, italics added.)

Pasadena relies on *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151 [217 Cal.Rptr. 893]. The *Bishop* court did not examine Guidelines section 15382, which we have quoted above, but it did address two additional sections of the Guidelines which discuss the role of economic and social changes in determining whether a project will have a significant effect on the environment. Subdivision (d) of section 15064 of the Guidelines directs the agency to consider both primary and secondary consequences of a project.[7] Subdivision (f) of Guidelines section 15064 is similar to Guidelines section 15382 in discussing the limited role which social and economic changes play in the determination of whether a project will have a significant effect on the environment.[8]

---

[7]Subdivision (d) of Guidelines section 15064 provides: "In evaluating the significance of the environmental effect of a project, the lead agency shall consider both primary or direct and secondary or indirect consequences. [¶] (1) Primary consequences are immediately related to the project such as the dust, noise, and traffic of heavy equipment that would result from construction of a sewage treatment plant and possible odors from operation of the plant. [¶] (2) Secondary consequences are related more to effects of the primary consequences than to the project itself and may be several steps removed from the project in a chain of cause and effect. For example, the construction of a new sewage treatment plant may facilitate population growth in the service area due to the increase in sewage treatment capacity and may lead to an increase in air pollution."

[8]Subdivision (f) of Guidelines section 15064 provides: "Economic and social changes resulting from a project shall not be treated as significant effects on the environment. Economic or social changes may be used, however, to determine that a physical change shall be regarded as a significant effect on the environment. Where a physical change is caused by economic or social effects of a project, the physical change may be regarded as a significant effect in the same manner as any other physical change resulting from the project. Alterna-

In *Bishop*, a developer sought approval of plans to build a shopping center with an area of 86,500 square feet on U.S. Route 395. The project would have required amendment of the general plan, rezoning, abandonment of a street and related street realignments, a zoning variance, and other approvals. When the board of supervisors adopted the planning commission's recommendation to issue two negative declarations under CEQA, a group of citizens filed petitions for writs of mandate to require a more complete environmental review. The plaintiffs argued that the environmental consequences of economic and social changes must be considered. They contended that the board was required to consider whether the shopping center would take business away from the downtown shopping area, resulting in business closures and the eventual physical deterioration of downtown Bishop. (172 Cal.App.3d at p. 169.)

The *Bishop* court construed Guidelines section 15064, subdivisions (d) and (f) to require the lead agency to consider the secondary consequences of economic and social change, but concluded that the agency "*may* find them to be insignificant." (172 Cal.App.3d at p. 170, italics in the original.) Applying this interpretation, the *Bishop* court concluded that the agency had to consider the possibility of *physical* deterioration of the downtown area as an indirect environmental effect of the shopping center. (*Id.* at pp. 170-171.)

As the State notes, Pasadena has made no showing or argument that the placement of the parole office on Walnut Street would cause the physical deterioration of the area. By contrast, the project at issue in *Bishop*—the construction of a major regional shopping center—clearly constituted physical change.

We are satisfied that Guidelines section 15064, subdivisions (d) and (f), interpreted with Guidelines section 15382, require the agency to consider economic and social consequences if they are related to a physical change in the environment. It is congruent with section 21100 which provides that, for purposes of that section, "any significant effect on the environment shall be limited to substantial, or potentially substantial, adverse changes in physical conditions which exist within the area as defined in Section 21060.5." Section 21060.5 defines the environment as "the physical conditions which exist within the area which will be affected by a proposed project, . . ." Guidelines section 15358, subdivision (b) is similar. It provides that "[e]ffects analyzed under CEQA must be related to a physical change." (See also

---

tively, economic and social effects of a physical change may be used to determine that the physical change is a significant effect on the environment. If the physical change causes adverse economic or social effects on people, those adverse effects may be used as the basis for determining that the physical change is significant. For example, if a project would cause overcrowding of a public facility and the overcrowding causes an adverse effect on people, the overcrowding would be regarded as a significant effect."

*City of Orange* v. *Valenti* (1974) 37 Cal.App.3d 240, 249 [112 Cal.Rptr. 379] [the court should not consider the characteristics of the persons utilizing an unemployment office located in an existing office building in analyzing environmental impact under CEQA]; *Mann* v. *Community Redevelopment Agency* (1991) 233 Cal.App.3d 1143, 1150-1151 [285 Cal.Rptr. 9] [interpreting CEQA Guidelines requiring discussion of alternatives capable of eliminating "significant adverse environmental effects" in final environmental impact report].)

The question of whether the Walnut Street lease constitutes a "significant effect" within the meaning of the exception to the exemption turns on whether Pasadena demonstrated that the lease was related to a physical change. We conclude that it did not.

In its reply brief, Pasadena concedes that as a general principle, CEQA does not address the purely social effects of a project. It then asserts: "But Appellant has never contended that the effects of this project were *only* social, not physical. And [the Department] is well aware of those physical effects. It supposedly moved the parole office from the Garvey Avenue location (a residential area on the border between Alhamba [*sic*] and Monterey Park heavily populated by school children) *because of* the physical/social effects the project was having: [¶] 'In June of 1988, the citizens of Alhambra and a neighboring city, Monterey Park, complained to city officials that there were "irregular activities" in the area surrounding the Garvey Office and pressured them to force [the Department] to relocate the office.' " Pasadena then clarifies its position regarding the physical impact of the Walnut Street lease: "The Court will note that the evidence the [Department] cites identifies some of those 'irregular activities' as the *vandalism* that was occurring around the Garvey Avenue office. . . . Vandalism is a 'physical' effect as opposed to a 'social' one." Pasadena cites no authority that unspecified vandalism constitutes a physical change within the meaning of CEQA.

It appears, therefore, that Pasadena's argument is based on evidence of the fear of "irregular activities" expressed by citizens of Monterey Park and Alhambra. While such accounts may have been sufficient to instigate the Department's policy decision to move the Garvey Street office, they are not substantial evidence under CEQA. As we have seen, the Guidelines expressly provide that "[m]ere uncorroborated opinion or rumor does not constitute substantial evidence." (Guidelines, § 15384, subd. (a).)

Excerpts of the deposition of Judy May Chu, Mayor of Monterey Park, were presented by both parties. Mayor Chu testified that she first learned of

the Garvey Street office when citizens telephoned her to complain about it. She was unable to recall how many telephone calls she received. She testified that she reviewed a study of crime conducted by the Monterey Park Police Department which revealed a 37.5 percent increase in crime in the area around the parole office. She also testified that citizens called to report criminal incidents. When asked for the specifics, Mayor Chu testified: "They mentioned seeing strange men around. They mentioned vandalism. That is what I recall."

The Alhambra Police Chief, Russell Siverling, testified that he reviewed a study conducted by his department which showed an increase in crime in the area of the Garvey Street office. Asked whether he thought the increase was attributable to the parole office, he testified: "It would be my opinion that there was some variable introduced into the area at the time that probably caused an increase in crime, and the only variable I am aware of is that parole office." Chief Siverling went on to say that both he and the public perceived the Garvey Street office as a threat to public safety.

While Pasadena submitted Jerome DiMaggio's testimony about general statistics regarding recidivism among parolees, there was no further showing that parolees were responsible for the incidents around the Garvey office. DiMaggio testified that the heavy concentration of police vehicles in the Walnut Street area would reduce the likelihood of crime related to the parolees at that location. He observed that Memorial Park borders the old police station and that police cars entering that station drive through a driveway on the east end of the park near the Walnut Street site. He explained that the new police station is located on the south side of Walnut across the street from the superior court, approximately 50 yards from the Walnut Street site.

While this record may establish a possibility of a social impact from the location of the parole office, it does not establish the requisite physical change. The only record regarding vandalism, which might be considered a physical impact, is the vague hearsay account by the mayor of Monterey Park. This does not constitute substantial evidence under CEQA.

Pasadena cites *City of Orange v. Valenti, supra,* 37 Cal.App.3d at page 247, for the proposition that an environmental review under CEQA must consider the effect of the particular use of a building, rather than the construction of the building itself in determining whether an environmental impact report is required. In *Valenti*, the claim was that a new building to house a state unemployment office would create adverse effects on traffic circulation and parking. The *Valenti* court held that these claims required

investigation by the State. But Pasadena makes no similar allegations in this case. *Valenti* is inapposite.

The other cases on which Pasadena relies to argue that the lease will have a significant effect are also inapposite. In *Shawn* v. *Golden Gate Bridge etc. Dist.* (1976) 60 Cal.App.3d 699 [131 Cal.Rptr. 867], the plaintiffs argued that a proposed increase in bus fares would increase the use of automobiles, causing increased traffic congestion, air pollution, and consumption of gasoline and other fuels. The court ruled that these possible impacts on the environment must be considered under CEQA. (*Id.* at pp. 701-703.) In *Day* v. *City of Glendale* (1975) 51 Cal.App.3d 817 [124 Cal.Rptr. 569], which Pasadena characterizes as involving the mere issuance of a permit, the project was for the construction of a highway. The court noted: "All parties agree that the grading project will have a significant effect on the environment." (*Id.* at p. 824.) The project involved moving "mountains" and filling 70 acres of canyon land with fill from the grading. (*Ibid.*) Finally, in *Myers* v. *Board of Supervisors* (1976) 58 Cal.App.3d 413 [129 Cal.Rptr. 902], a project to split a lot to allow construction of two homes on hilltops was found to require the construction of a road, draining improvements, grading of the hillside, and the installation of utility poles in a scenic area. These activities raised the possibility of soil erosion into a downstream reservoir, pollution from septic tank leach lines, fire hazards and the loss of nine specimen oak trees. (58 Cal.App.3d at pp. 425-426.)

Clearly each of these cases involved a physical change to the area within the meaning of CEQA. Given the nature of those changes, any indirect social and economic impacts could be considered.

Both sides in this case argue that federal decisions under the National Environmental Policy Act (NEPA) (42 U.S.C. § 4321 et seq.) are germane to construction of CEQA, since the statutory scheme and objectives of both laws are similar. We agree. (See *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 260-261 [104 Cal.Rptr. 761, 502 P.2d 1049]; *No Oil, Inc.* v. *City of Los Angeles, supra*, 13 Cal.3d at pp. 80-81, 83-85.) The leading federal case on whether nonphysical effects of a project alone may have an "environmental effect" is *Metropolitan Edison* v. *People vs. Nuclear Energy* (1982) 460 U.S. 766 [75 L.Ed.2d 534, 103 S.Ct. 1556]. In that case, the issue was whether the possible psychological harm to residents was a proper consideration under NEPA in reviewing the reopening of a nuclear reactor at Three Mile Island following the major accident at that facility. The Court of Appeals had constructed a facile syllogism to support its finding that NEPA requires evaluation of the potential psychological health effects of operating the reactor: "NEPA requires agencies to consider effects on

health. An effect on psychological health is an effect on health. Therefore, NEPA requires agencies to consider the effects on psychological health asserted by [the challenging party]. [Citation.]" (*Id.* at p. 771 [75 L.Ed.2d at pp. 540-541].)

The challenging party had argued that "because the psychological health damage to its members would be caused by a change in the environment" due to the renewed operation of the reactor, NEPA required the Nuclear Regulatory Commission to consider that damage. (460 U.S. at p. 771 [75 L.Ed.2d at p. 541].) Pasadena's argument in this case is similar; it relies on portions of CEQA which require an agency to take into account social and economic changes related to a physical change in the environment.

The Supreme Court examined the purpose of the statute and distinguished between objectives of NEPA and the statutory means selected to achieve them: "The theme of § 102 [of NEPA] is sounded by the adjective 'environmental': NEPA does not require the agency to assess *every* impact or effect of its proposed action, but only the impact or effect on the environment. If we were to seize the word 'environmental' out of its context and give it the broadest possible definition, the words 'adverse environmental effects' might embrace virtually any consequence of a governmental action that someone thought 'adverse.' But we think the context of statute shows that Congress was talking about the physical environment—the world around us, so to speak. NEPA was designed to promote human welfare by alerting governmental actors to the effect of their proposed actions on the physical environment. [¶] . . . [¶] Thus, although NEPA states its goals in sweeping terms of human health and welfare, these goals are *ends* that Congress has chosen to pursue by *means* of protecting the physical environment." (460 U.S. at pp. 772-773 [75 L.Ed.2d at pp. 541-542], italics in original, fn. omitted.)

Applying this distinction to the challenged project, the court observed that this "case bears strong resemblance to other cases in which plaintiffs have sought to require agencies to evaluate the risk of crime from the operation of a jail or other public facility in their neighborhood. [Citations.] The plaintiffs in these cases could have alleged that the risk of crime (or their dislike of the occupants of the facility) would cause severe psychological health damage. The operation of the facility is an event in the physical environment, but the psychological health damage to neighboring residents resulting from unrealized risks of crime is too far removed from that event to be covered by NEPA." (460 U.S. at pp. 776-777 [75 L.Ed.2d at pp. 543-544], fn. omitted.) The Supreme Court held that the terms "environmental effect" and "environmental impact" in NEPA "include a requirement of a reasonably close

causal relationship between a change in the physical environment and the effect at issue." (*Id.* at p. 774 [75 L.Ed.2d at p. 542].)

*Metropolitan Edison* is dispositive of the issue under NEPA. It was followed in *Olmsted Citizens for a Better Community* v. *U.S.* (8th Cir. 1986) 793 F.2d 201. The Eighth Circuit rejected a claim that conversion of a former mental hospital to a prison hospital would require preparation of an environmental impact statement. (*Id.* at pp. 203-207.) "Olmsted Citizens alleges that the effects of converting part of the mental hospital campus into a federal prisons hospital will include the introduction of weapons and drugs into the area, an increase in crime, and a decrease or halt in neighborhood development. These impacts, however, follow not from any physical changes connected with the conversion but from the social changes reflected in the nature of the use of the facility and in the types of people that will be present. Even before *Metropolitan Edison* this court had held that a project's potential for contribution to criminal activity and alteration of the character of a neighborhood would not require development of an environmental impact statement. [Citations.]" (*Id.* at p. 205.)

Pasadena does not discuss *Metropolitan Edison* or *Olmsted* in its briefing. It relies instead on two cases that preceded *Metropolitan Edison.* Both involved construction of the Metropolitan Correction Center in New York City. (*Hanly* v. *Mitchell* (2d Cir. 1972) 460 F.2d 640 and *Hanly* v. *Kleindienst* (2d Cir. 1972) 471 F.2d 823.) Pasadena cites language in these opinions to the effect that the psychological and social impact of placing a jail facility into a residential area must be considered under NEPA. These authorities are superseded by the Supreme Court's decision in *Metropolitan Edison, supra,* 460 U.S. 766 and can no longer be considered authoritative on this issue. It is apparent that no environmental impact statement would have been required under NEPA based on the record provided by Pasadena.

Pasadena's other arguments in support of the "significant effects" exception are also unavailing. The city's argument that the exception applies is based on its characterization of the area surrounding the Walnut Street site as residential, of historic and cultural significance, and of established education and recreational use. In support of this argument, Pasadena invokes appendix G of the Guidelines, which defines projects which will normally have a significant effect on the environment. It argues that three of these categories apply here. They concern projects which will: "(a) Conflict with adopted environmental plans and goals of the community where it is located"; "(j) Disrupt or adversely affect a . . . property of historic or cultural significance to a community . . . ," and "(w) Conflict with established recreational, educational, religious or scientific uses of the area."

But Pasadena has not shown how the parole office would "disrupt or adversely affect" the use of the library and surrounding area or would conflict with the established uses. The record does establish that the Central Library is a structure of both historic and cultural significance. Pasadena makes no showing that the significance of the building will be adversely impacted by the parole office.

Similarly, Pasadena merely makes a bald assertion about the impact on established recreational and educational uses in the area: "The placement of a parole office on Walnut Street will not only conflict with existing educational uses of the Central Library, it will also conflict with the All Saints Episcopal Church Children's Center across the street and the City's goals to revitalize Memorial Park, located just a 1/4 mile away." This showing is insufficient to establish a significant effect within appendix G to the Guidelines. (See *Cathay Mortuary, Inc.* v. *San Francisco Planning Com.* (1989) 207 Cal.App.3d 275, 281 [254 Cal.Rptr. 778] ["while the selection of the property as a park site has indeed generated a serious public controversy, real parties have not shown that the controversy is related to any environmental issue."].)

The Pasadena Master Plan, adopted in 1989, anticipates further residential development in the area surrounding the Walnut Street site. "Housing needs identified in a general plan are simply goals, not mandated acts. [Citation.]" (*Marin Mun. Water Dist.* v. *KG Land California Corp.* (1991) 235 Cal.App.3d 1652, 1668 [1 Cal.Rptr.2d 767].) But, in light of the courthouse, jails, and probation office already at the location, Pasadena can hardly argue that this is an entirely residential area.[9] The continued use of the Walnut Street site for office purposes in itself does not constitute a significant adverse environmental impact.

We conclude that Pasadena failed to provide substantial evidence that the exception for significant effects under Guidelines section 15300.2, subdivision (c) applies. Therefore, the categorical exemption was properly issued and Pasadena's petition for writ of mandate was properly denied.

II

*Government Code Section 14681.5*

■ Pasadena argues that the Department did not adequately comply with the notice requirement of Government Code section 14681.5. That statute

---

[9]State has called our attention to Pasadena's revised zoning ordinance that requires certification that a project is in compliance with CEQA before a building permit is issued. (Pasadena Mun. Code, §§ 17.80.010-17.80.050.) It is inferable from this ordinance, as State argues, that the Pasadena authorities determined that the Walnut Street lease would not violate the master plan because a building permit was issued for the alterations to the Walnut Street site. While we have taken judicial notice of this ordinance, as requested, we do not consider it dispositive of the issue.

provides in pertinent part: "Whenever the Director of Corrections, . . . decides either to go out to bid to construct a state building, expand an existing building, expand the use of an existing building, or enter into a lease of an existing building, he or she shall notify in writing, at least 60 days prior to going out to bid or entering into a lease, all of the following officials of his or her intent to construct, expand, or lease the building, along with a description of the building . . . ." The statute specifies that this notice must be given to legislators whose districts encompass the location at issue, to the clerk of the county board of supervisors, and to the city clerk and mayor of the city in which the building at issue is or will be located.

Pasadena argues that the State engaged in "misdirection" and the use of "strawmen" to divert attention from its interest in the Walnut Street site. The notice, it asserts, should have been sent out 60 days before the lease was signed. In essence, Pasadena argues that the notice given by the Department was premature.

We find nothing in the statute to support this construction. The history of the negotiations for this site, which we have described, establishes the great difficulty in stating with certainty 60 days prior to the execution of a lease just where the office will be. The notification sent by the Department alerted Pasadena to the prospect that a parole office would be placed at one of the sites listed. We have summarized the public reaction in Pasadena as the Department considered one site after another for the parole office. Pasadena appears to complain that the Department gave it notice of too many possible locations pursuant to Government Code section 14681.5. We find no merit in the argument.

### III

#### Due Process

Pasadena argues that the relocation of the parole office from Garvey Street to the Walnut Street site constitutes a violation of its right to substantive due process under the state and federal Constitutions. Pasadena supports its argument by its claim that the relocation was motivated by a "bribe" because Monterey Park and Alhambra agreed to share in the costs of relocation.

" 'The due process clauses of the state and federal Constitutions, in their "substantive" aspect, provide checks on the government's power to act unfairly or oppressively.' [Citations.]" (*In re Cindy B.* (1987) 192 Cal.App.3d 771, 783 [237 Cal.Rptr. 677].) "To establish a violation of substantive due process, the plaintiffs must prove that the government's action was 'clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.' *Village of Euclid* v. *Ambler Realty Co.*, 272 U.S. 365, 395, 47 S.Ct. 114, 121, 71 L.Ed. 303

(1926) [other citations omitted]." (*Sinaloa Lake Owners Ass'n.* v. *City of Simi Valley* (9th Cir. 1989) 882 F.2d 1398, 1407.)

 Pasadena argues that the reasons for relocating the Garvey office were political and financial. It also claims that the Department did not act in good faith because it sought recompense for the costs of relocation from Alhambra and Monterey Park; there was no evidence that Garvey Street was not a suitable location; the Walnut Street site was leased in violation of its guidelines against locating a parole office near schools or parks; the Department failed to analyze significant environmental effects; it told Pasadena officials at one point that Walnut Street was unsuitable; and it wasted taxpayer money by leaving the Garvey Street site and renting the more expensive Walnut Street site. As a result, Pasadena asserts that it will suffer irreparable injury because a parole office has been "forced upon Pasadena at a location which is frequented by hundreds of school children daily, which the State itself concluded was 'not suitable' for a parole office, and which will conflict with and disrupt Pasadena's Civic Center Master Plan aimed at renovating and revitalizing the Civic Center."

We already have discussed Pasadena's failure to submit substantial evidence of the actual harm which will result from the location of the parole office on Walnut Street. Pasadena's argument does not take into account the fact that the residents of Alhambra complained about the presence of two parole offices in that city, one of which was utilized by five hundred residents of Pasadena. The decision to relocate the Garvey Street office was motivated, at least in part, by an intent to remedy that inequity.

The record reflects the efforts of the Department to gain some cooperation from Pasadena officials in finding a site for the parole office. This process could have been much shorter than the two-year period involved if the Department had arbitrarily ignored the concerns of Pasadena residents and chosen a site without consultation with local officials.

We find no merit in Pasadena's contention that it was deprived of the right to due process.

### DISPOSITION

The judgment denying mandate is affirmed.

Vogel (C. S.), J., and Hoffman, J.,* concurred.

---

*Judge of the Municipal Court for the Los Angeles Judicial District sitting under assignment by the Chairperson of the Judicial Council.