[Civ. No. 13132. Fourth Dist., Div. Two. Jan. 17, 1974.]

CITY OF ORANGE, Plaintiff and Appellant, v.
PETE C. VALENTI et al., Defendants and Respondents.

## COUNSEL

Furman B. Roberts, City Attorney, for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, Iver E. Skjeie and Henry G. Ullerich, Deputy Attorneys General, Cochran, Dickerson & Shepphird and Joe A. Dickerson, for Defendants and Respondents.

## OPINION

**GARDNER, P. J.**—The City of Orange brought this action to obtain an injunction compelling the State of California and Pete C. Valenti, Donald A. Bailey, Alex. B. DeFiore, a joint venture (hereinafter "VDB"), to comply with certain local ordinances and the California Environmental Quality Act. VDB owns an office building at 1524 East Mayfair Avenue in the City of Orange which it leased to the state for use as an unemployment insurance office; the Department of Human Resources Development was the first tenant to occupy the building. The office was opened to the public on May 22, 1972.

Shortly before the office opened, in response to protests by neighboring residents, the city passed two urgency ordinances regulating "public service office buildings." One established special parking requirements (ordinance 23-72); the other required a conditional use permit for such buildings even in zones where they are otherwise permitted (ordinance 24-72). The ordinances expressly recite that immediate enactment is necessary because of the impending opening of the office at 1524 East Mayfair. Pre-existing city ordinances specify the number of off street parking spaces required for particular uses (Orange Municipal Code, § 9125.1) and provide that if the use is not mentioned, the city planner shall determine the require-

ments based on the requirements for the most comparable use which is described (Orange Municipal Code, § 9125.2). The lease between VDB and the state provides that the premises must conform to all applicable codes, ordinances and zoning laws.

The complaint is divided into five causes of action, all seeking an injunction and a writ of mandate ordering the state and VDB to comply with particular laws and ordinances. The first cause of action alleges the enactment of the special parking ordinance (23-72); the second alleges enactment of the conditional use permit requirement (24-72). The third cause of action alleges that the unemployment insurance office use was not described in Orange Municipal Code section 9125.1, and that the city planner was not able to determine parking requirements pursuant to Orange Municipal Code section 9125.2 because the precise use was never described to the city planner by any of the defendants. The fourth and fifth causes of action allege failure to comply with the California Environmental Quality Act in that no environmental impact statement was prepared (Pub. Resources Code, § 21100) and there was no consultation with the city prior to making a detailed statement (Pub. Resources Code, § 21104). The trial court sustained the demurrers of all defendants to all causes of action in the second amended complaint without leave to amend and dismissed the action. (Demurrers to the first amended complaint had previously been sustained with leave to amend as to the first, second, and third causes of action, but overruled as to the fourth and fifth causes of action.)

## VALIDITY OF THE URGENCY ORDINANCES

The first and second causes of action refer to the two urgency ordinances adopted after the lease was signed and shortly before the opening of the office. These ordinances are clearly discriminatory; they are obviously aimed at stopping the establishment of the unemployment insurance office, even though the pre-existing zoning would permit the use. The ordinances themselves recite this in the urgency clause. As in *Sunset View Cemetery Assn.* v. *Kraintz,* 196 Cal.App.2d 115 [16 Cal.Rptr. 317], the only "emergency" was the pending action which the legislative body wanted to prevent. The ordinances here were intended to frustrate the state's plans, which were perfectly proper when the lease was executed. This is the plain discrimination condemned in *Sunset View Cemetery Assn.* v. *Kraintz, supra;* the trial court correctly determined that it could not enjoin the defendants to comply with these unconstitutional ordinances and properly sustained the demurrers without leave to amend.

The ordinances were discriminatory against both VDB and the state,

so the city's argument that VDB cannot share in the state's exemption from compliance with zoning laws (*Hall* v. *City of Taft,* 47 Cal.2d 177 [302 P.2d 574]; *County of Los Angeles* v. *City of Los Angeles,* 212 Cal.App.2d 160 [28 Cal.Rptr. 32]) is immaterial in regard to these ordinances. The city's argument that the last minute ordinances would not have been necessary if the state or VDB had made their plans known earlier does not save the ordinances. They would still have been discriminatory if enacted several months earlier, because still designed to frustrate the legitimate purposes of the defendants, and aimed at them alone.

## APPLICATION OF THE PRE-EXISTING PARKING REGULATIONS

■ The pre-existing parking requirements (Orange Municipal Code, §§ 9125.1, 9125.2) do not suffer from the discriminatory defects of the urgency ordinances. The third cause of action attempts to allege non-compliance with this valid ordinance.[1]

However, the ordinance cannot be applied against the state. When the state engages in such sovereign activities as the construction and maintenance of its buildings (and leasing of the building is no different), it is not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulations. (*Hall* v. *City of Taft, supra,* 47 Cal.2d 177, 183; *County of Los Angeles* v. *City of Los Angeles, supra,* 212 Cal.App.2d 160, 165.) The parking ordinances apply solely to the state as the user of the building, not to the owners, because the number of spaces required is to be determined based on the *use* of the property. If the ordinance were applicable, and if more spaces are required than are provided, the use of the building as an unemployment insurance office would have to be curtailed. This would have the effect of limiting the state's sovereignty by local regulation, which is prohibited by *Hall* v. *City of Taft, supra.*

*Hall* specifically indicates that the Legislature may consent to regulations by local government. The city argues that it has done so here by the

---

[1]In at least one respect the pleading is defective. Municipal Code section 9125.2 does not require the building occupants to inform the city planner of the use they plan to make of a building, it requires the planner to set parking requirements. The building had been in use for months before the second amended complaint was filed; the planner must have known of the use by that time. Neither the ordinance nor any other principle requires the state to inform the planner of the maximum use intended for the office; retail store owners are certainly not required to limit the number of people they invite, by advertising, to come to their premises. Since it is possible the city planner has established parking requirements pursuant to the ordinance, it may be possible to successfully amend the complaint to allege this. This defect alone would not justify sustaining the demurrer without leave to amend.

lease provision on compliance with applicable local ordinances, while the state contends that such consent must come from the Legislature by statute, not from the agreement of a leasing agent. Apparently no cases discuss the nature of the consent which would permit the state to be bound by local regulations.

In some circumstances, the Legislature has given this consent by statute. For example, Government Code sections 53090-53095 provide that local agencies which perform state functions (such as school districts) shall comply with city or county building and zoning ordinances. But the consent is limited; a school board may, by two-thirds vote, render a zoning ordinance inapplicable. (Gov. Code, § 53094.) The action of the Legislature in giving consent in some circumstances without giving it here,[2] leads to the possible inference that no consent was intended which was not granted by statute.

A stronger reason for holding that the Legislature's consent must be expressed in a statute can be drawn from the analogy to the state's sovereign immunity from damage claims. This immunity stems from the sovereignty of the state, as does the exemption from local regulations. And it is clear that no agent of the state can waive this immunity; liability may be derived only from an express statute. (Gov. Code, § 815.) So, just as an agent of the state may not waive statutory immunity, a leasing agent may not waive the state's right to be free from local regulations.

And even if an express statute is not necessary to find consent, it is doubtful consent could be found from this lease. The obligation to comply with zoning ordinances is an obligation of VDB, the lessor, rather than the state. The city was not a party to the lease. There is no reason why the state could not waive VDB's obligation if it became burdensome.

For these reasons, it would be impossible for the city to state a cause of action based on violation of Orange Municipal Code section 9125.2, and the court correctly sustained the demurrer without leave to amend in regard to the third cause of action.

### APPLICABILITY OF THE CALIFORNIA ENVIRONMENTAL QUALITY ACT

■ The fourth and fifth causes of action attempt to allege a violation of the California Environmental Quality Act. (Pub. Resources Code,

---

[2]The city's contention that the Legislature has consented by authorizing the Director of the Department of General Services to lease property (Gov. Code, § 14669) is analogous to the contention that former article XI, section 11 (now art. XI, § 7) of the state Constitution, which gives certain powers to cities and counties, conferred on cities the power to regulate the state. *Hall* expressly rejected the latter contention. (47 Cal.2d at p. 183.)

§ 21000 et seq.) As it read when the office was opened in 1972, Public Resources Code section 21100 required all state agencies to include an environmental impact statement in any report on any project which could have a significant effect on the environment. (The section was amended in 1972 to require the preparation of an environmental impact report on such projects without regard to the preparation of any other report.) The complaint alleges that the use of the leased building by the state is a project which could have a significant effect on the environment, and that the state has not complied with the law requiring an environmental impact statement.[3] The principal adverse environmental effect alleged is increased traffic and parking problems.

The California Environmental Quality Act (CEQA) is very similar in purpose and language to the federal National Environmental Policy Act (NEPA). (42 U.S.C. § 4331 et seq.) Judicial interpretation of the federal law is, therefore, strongly persuasive in determining the meaning of the California statute. (*Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247, 260-261 [104 Cal.Rptr. 761, 502 P.2d 1049]; *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.,* 27 Cal.App.3d 695, 701 [104 Cal.Rptr. 197].) And a federal case decided under NEPA has discussed an issue very close to the one before us here. In *Save Our Ten Acres* v. *Kreger* (5th Cir. 1973) 472 F.2d 463, the plaintiffs sought to enjoin construction of a federal office building in downtown Mobile, Alabama, on the grounds that the General Services Administration had failed to prepare an environmental impact statement. As here, the complaint alleged parking and traffic problems would be created by the action, and a trial court ruled plaintiffs had not alleged facts entitling them to relief. The Court of Appeals held that plaintiffs had stated facts which would entitle them to relief, and the trial court should hear evidence to review the GSA's determination that the building would have no significant effect on the environment.

The only distinction between this case and *Save Our Ten Acres* v.

---

[3]Again, the complaint is formally defective. It does not allege that any general report was prepared, or fund authorization request made, in regard to the leasing of the building. At the time the lease was executed, the law required an environmental impact statement to be included in any *report* on a proposed project which may have a significant effect on the environment (Pub. Resources Code, § 21100), or to accompany any fund authorization. (Pub. Resources Code, § 21102.) Also, section 21104 only requires consultation with other agencies when a detailed statement is required; it does not impose a separate duty, so it is difficult to see how there can be a separate cause of action for failure to consult with the City of Orange. These defects may possibly be cured by amendment, however. It should be noted that the first demurrer was overruled on these causes of action, so that the city has not been given even one opportunity to amend them.

*Kreger, supra,* is that here the state leased a building rather than constructing a new one. (Though the state is the first tenant.) The Attorney General argues that the leasing of the building is not a "project" within the meaning of CEQA. The original act contained no definitions, but the 1972 amendments (Stats. 1972, ch. 1154) added several. "Project" was defined in part as "Activities directly undertaken by any public agency," and in part as "Activities involving the issuance to a person of a lease . . . for use by one or more public agencies." (Pub. Resources Code, § 21065, subd. (a).) The director of the Department of General Services leased the building; the Department of Human Resources Development uses it as an unemployment insurance office. These are unquestionably activities directly undertaken by the state. Although the lease and occupancy of the building occurred prior to the effective date of the 1972 amendments, the definitions added to the act then were intended to declare and clarify the existing law, not to change it. (Stats. 1972, ch. 1154, § 17.) *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d 247, decided before the 1972 amendments, holds that the word "project" must be given a broad definition consistent with CEQA's intention to protect the environment. The conclusion that leasing a building is a "project" seems inescapable.

Two federal Court of Appeals opinions in the same case, a case challenging the failure to file an environmental impact statement in connection with construction of a federal jail in New York City, also support the proposition that an environmental impact statement may be necessary even in an urban setting where the land is zoned for the use proposed. (*Hanly* v. *Mitchell* (2d Cir. 1972) 460 F.2d 640 [4 E.R.C. 1152];[4] *Hanly* v. *Kleindienst,* (2d Cir. 1972) 471 F.2d 823 [4 E.R.C. 1787]; accord, *Goose Hollow Foothills League* v. *Romney* (D.Ore. 1971) 334 F.Supp. 877 [3 E.R.C. 1087].)

The state's citation of *Howard* v. *Environmental Protection Administration* (W.D.Va. 1972) 4 E.R.C. 1731, is inappropriate. In *Howard* the court held that no environmental impact statement was required for a regional sewage treatment plant (admittedly an "action" within the meaning of NEPA) because factually it had been shown the plant would have no adverse effects. Here adverse effects on traffic circulation and parking are alleged, and must be taken as true for the purposes of the demurrer. If it should be established as a matter of fact that the allegation is false, no environmental impact report would be necessary. But such a factual showing must be made at trial or by declaration in support of a motion

---

[4]The reference is to Environmental Reporter—Cases, Bureau of National Affairs, Washington, D.C.

for summary judgment. It is important to remember that this is a pleading case, as was *Save Our Ten Acres* v. *Kreger, supra,* 472 F.2d 463. Our holding that the city has stated a cause of action on the issue is simply that, not a holding that an environmental impact statement must be filed.

The state's primary argument in support of the demurrer is that it is now too late to do anything about the unemployment insurance office—the building is built and the office has been operating for over a year. An environmental impact report cannot influence the planning for the office, which has already been done, and an unfavorable assessment of its environmental impact would not prevent the Department·of Human Resources Development from continuing to operate the office at its present location.

It is true that injunctive relief will not be granted where events have rendered such relief ineffectual. (*Paul* v. *Milk Depots, Inc.,* 62 Cal.2d 129, 133 [41 Cal.Rptr. 468, 396 P.2d 924]; *Scott* v. *Scott,* 51 Cal.2d 249, 254 [331 P.2d 641].) At least one federal court has held it is impracticable to apply NEPA when a freeway has reached an advanced stage of construction. (*Environmental Law Fund* v. *Volpe* (N.D.Cal. 1972) 340 F. Supp. 1328.) But this structure is not a freeway, it is a building suitable for uses other than an unemployment insurance office, and it is the state's particular use, not the construction of the building itself, which allegedly damages the environment. That damage, if any, will end when the use ends. The environmental damage from a freeway is created in large part by its very construction; therefore cases dealing with environmental impact statements on freeways are of only limited value.

Even so, federal cases on freeway construction have formulated a useful test for determining whether highway construction has progressed so far that the application of NEPA should be considered impracticable. This is when the freeway "has reached the state of completion where the costs of abandoning or altering the proposed route would clearly outweigh the benefits therefrom." (*Arlington Coalition on Transportation* v. *Volpe* (4th Cir. 1972) 458 F.2d 1323; *Keith* v. *Volpe* (C.D.Cal. 1972) 352 F.Supp. 1324, 1332 [4 E.R.C. 1351].) A similar test was formulated in *Environmental Law Fund* v. *Volpe, supra,* 340 F.Supp. 1328. Paraphrasing the above standard, an environmental impact report would be impracticable here only if the state could show that the costs of moving the office to another location would clearly outweigh the environmental benefits of such a move. That would require a factual showing which has not been made here because of the procedural status of this case. The fact that the office is open does not necessarily mean that the costs of relocating it will outweigh the benefits.

The state also suggests that preparation of a report would now be futile because a report recommending limiting the level of service would create no legally enforceable duty to do so. Even if this were true,[5] it would not excuse violation of the law. The same argument could be made in regard to every project, in any state of completion.

We agree with respondents that the social characteristics of the prospective customers of the agency are not an element for consideration in the determination whether an environmental impact report will be necessary. (See *Nucleus of Chicago Homeowners Association* v. *Lynn* (D.C.Ill 1973) 372 F.Supp. 147.) On the other hand, we cannot agree with respondents' contention that traffic and parking congestion cannot have a significant effect on the environment within the meaning of CEQA. While traffic and parking congestion, per se, may be one of the crosses to be borne by an automobile-oriented society, this is not to say that traffic and parking congestion may not have a significant effect on the environment of any particular area or locality. If, as respondents contend, this is a commercial area of such character that a few dozen additional cars (or a few hundred depending on the economy) would be expected to be a logical part of that local environmental picture, it could then be said that the existence of this agency would have no significant effect on the environment of that particular area. If this were the case, the trial court could well find that no environmental impact report is necessary. On the other hand, if the agency is located in an area in which, ordinarily, traffic and parking congestion would not be expected to be a part of the everyday picture, another result may ensue. Contrary to respondents' contention, the state may not put a traffic snarling, parking congesting activity, slam-bang in the middle of a quiet, single-family residential area, thus drowning that area in a sea of automobiles without the necessity of first obtaining an environmental impact report.

## CONCLUSION

The trial court correctly sustained the demurrer without leave to amend in regard to the first, second and third causes of action. The demurrer was also correctly sustained in regard to the fourth and fifth causes of action,

---

[5]A decision to operate the office in the face of severe adverse environmental effects might be so arbitrary and capricious as to entitle the city to a writ of mandate, but we express no opinion on the subject.

but leave to amend should have been granted. The judgment of dismissal is reversed.

Tamura, J., and Gabbert, J., concurred.